IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JODI BREITERMAN )<br>38425 Rooster Lane )<br>Mechanicsville, MD 20659, )<br>)<br>    Plaintiff, )<br>)<br>    v. )<br>)<br>THE UNITED STATES CAPITOL POLICE )<br>)<br>119 D Street, N.E. )<br>Washington, DC 20510, )<br>)<br>    Defendant. )<br>)<br>Serve: )<br>)<br>UNITED STATES ATTORNEY'S OFFICE )<br>FOR THE DISTRICT OF COLUMBIA )<br>Attn: Civil Process Clerk )<br>United States Attorney's Office )<br>555 4th Street, NW )<br>Washington, DC 20530 )<br>*-Via Certified Mail* )<br>)<br>UNITED STATES ATTORNEY GENERAL )<br>10th & Pennsylvania Avenue, NW )<br>Washington, DC 20530 )<br>*-Via Certified Mail* )<br>)<br>THE UNITED STATES CAPITOL POLICE )<br>119 D Street, N.E. )<br>Washington, DC 20510 )<br>*-Via Certified Mail* )<br>)<br>) | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR EQUITABLE AND**
<u>**MONETARY RELIEF AND DEMAND FOR JURY TRIAL**</u>

Plaintiff Jodi Breiterman brings this suit against Defendant The United States Capitol Police (USCP) for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (2006), as incorporated with respect to agencies of Congress by the Congressional Accountability Act (CAA), 2 U.S.C. §§ 1301-1438 (2006), and for violating Breiterman's freedom of speech rights under the First Amendment to the U.S. Constitution, when it suspended Breiterman and demoted her for providing a photograph to the press of a loaded weapon left by a USCP officer in a public restroom, and for routine email exchanges she had with colleagues which USCP misrepresented as "inappropriate."

## PARTIES

1.  Plaintiff Jodi Breiterman is domiciled in St. Mary's County, Maryland and employed by USCP as a Sergeant. She is an "employee" as defined by 42 U.S.C. § 2000e (Title VII) and a "covered employee" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(c).

2.  Defendant USCP is a federal law enforcement agency with headquarters located at 119 D Street, NE, Washington, D.C. 20510. USCP is an "employer" as defined by 42 U.S.C. § 2000e (Title VII) and an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D), and is a proper defendant in this action under 2 U.S.C. 1408(b).

## JURISDICTION AND VENUE

3.  This Court has personal jurisdiction over USCP because USCP conducts regular business in the District of Columbia and because it maintains regular and systematic contacts with the District of Columbia.

4. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of United States, specifically Title VII, the CAA, and the First Amendment to the U.S. Constitution.

5. Venue in this district is proper under 28 U.S.C. § 1391(b) because it is the judicial district where the unlawful employment practices are alleged to have been committed and because USCP may be found in this district.

6. Breiterman has exhausted the administrative remedies available to her.

## FACTUAL ALLEGATIONS

7. Breiterman is a 44-year-old female residing in Mechanicsville, Maryland.

8. Breiterman's father and several members of her extended family worked in law enforcement, and Breiterman decided at a young age that she too wanted a career in law enforcement.

9. Breiterman took her first law enforcement position in 1999 as a Corrections Officer at the Charles County, Maryland Detention Center.

10. She excelled in that position for two years.

11. In the summer of 2001, Breiterman applied to be a U.S. Capitol Police officer and started her career with USCP in January 2002 after completing training.

12. Breiterman has excelled in the performance of her USCP duties for more than 13 years and, prior to her recent demotion, was a Sergeant.

13. She is highly respected by her colleagues and has received approximately one dozen awards, many letters of recognition, and was named Police of the Year in 2011.

14. Before the events that are the subject of this complaint, she worked as a Project/Management Analyst.

15. Her duties as Project/Management Analyst included serving as project manager; managing training costs and the performance of 25 officers; briefing leadership on the cost, schedule, performance, and risk of planned events at the House, Senate, Architect of the Capitol, and other federal agencies; serving as project lead for crisis negotiation; managing a risk team on collected intelligence information; developing life cycle support plans; compiling statistics; and conducting employee evaluations.

16. Breiterman has successfully completed various training programs at the Northern Virginia Criminal Justice Academy, the Federal Law Enforcement Training Center, and the National Geospatial College, including training in hostage negotiations, surveillance, and digital mapping systems.

17. At USCP, Breiterman is known as someone who speaks her mind and is fair, firm, and consistent.

18. In approximately 2013, Breiterman was told by Inspector J.J. Pickett, her supervisor at the time, that she will "never get ahead" at USCP because she "won't shut [her] fucking mouth."

19. Breiterman replied, "I am not a gossip, but I speak my mind when things are not right."

20. There have been several incidents in which Breiterman refused to silently accept unfair and discriminatory practices by her superiors and was disciplined for speaking out in opposition to those unfair and discriminatory practices.

21. In approximately 2014, for example, Breiterman applied for a job in USCP's intelligence division and two deputy chiefs selected her as the most qualified candidate for the position.

22. But Breiterman's selection was not finalized because the Assistant Chief of the USCP had not signed off on it.

23. About one week after Breiterman was told that she was selected for the position, she learned that USCP had given the job to a colleague, Jolania Cobbin, who is African-American.

24. Cobbin is a 25-year veteran of the USCP but she had not applied for the position and was expected to retire soon.

25. Breiterman filed an EEO complaint in approximately April 2014 regarding USCP's failure to select her for the intelligence division position.

26. Breiterman attended mediation for the 2014 EEO claim.

27. The mediator agreed that Breiterman had been "wronged" by the non-selection, but USCP did not offer a meaningful remedy; rather, it offered only a minor schedule change.

28. Breiterman, on her own initiative and based on her own merit, assumed a new position as Administrative Sergeant, a role in which she excelled.

29. After taking this new position, Breiterman dropped her EEO complaint.

30. As another example, in 2014, Breiterman told USCP's Chief that she felt that a female officer had to sleep with someone to get promoted within the USCP

31. A USCP officer overheard Breiterman's comment while she was in the supervisor's office and repeated Breiterman's comment to a married female officer, who received a three day suspension for having an improper extramarital relationship with the Deputy Chief.

32. The married female USCP officer complained about Breiterman's statement regarding USCP's gender discriminatory practices.

33. Human Resources then accused Breiterman of making an improper comment, detrimental behavior, and "conduct unbecoming" based solely on her comment to a superior that a female officer had to sleep with someone to get promoted within the USCP.

34. This complaint resulted in Breiterman's two-day suspension.

35. Breiterman appealed this two-day suspension in or about February 2015, and the suspension was not imposed until September 9, 2015.

36. When the affair referenced above between the married female officer and the married Deputy Chief became public, the married female officer only received a three-day suspension for the improper relationship.

37. On January 29, 2015, Breiterman received a radio call about a handgun found in a bathroom in the Capitol Visitor's Center by a Congressional staffer.

38. Breiterman was sent to the scene, along with several other officers.

39. At the scene, Breiterman found the gun lodged in the toilet tissue holder and visible to anyone using the public bathroom.

40. Breiterman took photos of the handgun, as did other officers.

41. Breiterman identified the handgun as a USCP service weapon.

42. USCP later ran a check on the handgun and confirmed that it was a USCP service weapon.

43. Later that day, Breiterman overheard a uniformed USCP officer ask a plainclothes USCP officer assigned to Dignitary Protection, "Did you check for your gun?", apparently realizing the other officer had left it in the bathroom.

44. The USCP officer who left the handgun in the bathroom went to the captain, explained what happened and was able to get his gun back without suffering any immediate disciplinary consequences.

45. Breiterman was shocked that USCP returned the weapon to the officer without discipline or other repercussions.

46. For a few weeks following the incident, Breiterman heard no other discussion of the USCP handgun left in the Capitol Visitor's Center bathroom.

47. In or around February 2015, Breiterman received a call from Hannah Hess, a reporter for Roll Call, a publication which focuses on Capitol Hill.

48. Breiterman and Hess are acquaintances.

49. During the call, Hess asked Breiterman about an incident in which a USCP officer left a handgun in the Speaker of the House's office, which was later found by a child (who happened to be the grandson of Arnold Palmer).

50. Breiterman told Hess that she did not have any information regarding this incident.

51. Hess then asked Breiterman about a second incident in which a Sergeant's abandoned handgun was found by cleaning staff in a bathroom in USCP headquarters.

52. Breiterman told Hess that she knew nothing regarding this second incident.

53. Hess knew many details regarding the two incidents and referred to those details.

54. Finally, Hess asked Breiterman about a handgun allegedly left in a public bathroom at the Capitol Visitors' Center.

55. Breiterman confirmed that she knew about this specific incident.

56. Breiterman told Hess that she had taken a photograph of the handgun left in a public bathroom at the Capitol Visitors' Center.

57. Hess asked, "Can I see it?"

58. Breiterman texted the photo to Hess.

59. On or about May 1, 2015, an article titled, "Capitol Police Left Guns in Bathrooms," appeared in Roll Call featuring the photo Breiterman sent to Hess.

60. Hess never asked for Breiterman's permission to publish the photo.

61. Breiterman's name was not mentioned in the article and she did not tell Hess anything else about the incident.

62. The story generated significant public interest locally and nationally, including some late night talk show hosts who lampooned the incident.

63. Captain Drew Bollinger, who is not Breiterman's immediate supervisor, publicly said that whoever had given the photo to the press should be fired.

64. Bollinger's wife, Inspector Kim Bollinger, is the commander of USCP's Office of Professional Responsibility (OPR).

65. Inspector Bollinger told her husband, Captain Bollinger, that USCP's Inspector General's (IG) office and OPR were having meetings to determine who provided the photo and to terminate the person once the person was identified.

66. USCP's IG and OPR offices are not permitted to share information about an ongoing investigation in this manner.

67. On June 22, 2015, another Sergeant who had taken a photo of the abandoned weapon contacted Breiterman.

68. The Sergeant told Breiterman that he was questioned by Internal Affairs (OPR) on June 18, 2015 about whether he had taken a photo of the handgun left in the Capitol Visitor's Center bathroom.

69. The Sergeant told Breiterman that he had been identified as a witness in an ongoing investigation.

70. On the same day, Internal Affairs summoned Breiterman and gave her a letter, dated June 22, 2015, which said she was under investigation for a violation as a respondent, not a witness.

71. During this meeting, Breiterman readily admitted that she took a photo of the gun and sent it to her personal email.

72. It is a common practice of USCP officers to save interesting mementos such as photos of political demonstrations or famous people.

73. When Internal Affairs asked if she had given the photo to Hess, Breiterman said that she had.

74. Breiterman was asked why she sent the photo to Hess.

75. Breiterman said that Hess had told her that she wanted to see the photo, and that Breiterman had sent it to her.

76. Breiterman, in fact, sent the photo to Hess because she believed the matter involved serious issues of public safety and was of significant public concern.

77. USCP immediately suspended Breiterman for an indefinite period and took her badge, gun and credentials.

78. The Internal Affairs Sergeant, Mark Shutters, asked Breiterman write a statement.

79. Breiterman wrote, "I gave Hannah Hess the photo."

80. Shutters, the Internal Affairs Sergeant, told Breiterman that he wanted Breiterman to say that she did it because she "hated the Capitol Police."

81. This statement – that Breiterman "hated" USCP and provided the photo for that reason – was untrue.

82. Breiterman, despite being pressured and harassed by Shutters, refused to make the false statement that he wanted.

83. Breiterman told Shutters that the Sergeant questioned on June 18, 2015 about his photo of the handgun had told her (Breiterman) about his questioning by Internal Affairs.

84. OPR took no action to investigate or discipline this Sergeant for speaking to Breiterman about his interactions with Internal Affairs.

85. Breiterman's "indefinite" suspension ultimately lasted for more than ten months, ending only on May 4, 2016.

86. On June 23, 2015, Shutters ordered Breiterman to call in to USCP every morning during her suspension.

87. During the ten-month suspension, USCP required Breiterman to stay at home from 8 a.m. to 4 p.m. and to call Internal Affairs if she needed to leave her home for any reason during those hours.

88. USCP also required Breiterman to use personal leave any time during her ten-month suspension when she had to leave her home during the hours of 8 a.m. to 4 p.m., even though she had no duties and always remained accessible by mobile phone.

89. On several occasions, Breiterman called Internal Affairs to report that she needed to leave her home and no one answered the phone, forcing her to leave messages.

90. On June 23, 2015, Breiterman went to USCP's OPR office for a second interview.

91. On or about July 27, 2015, Hess called Breiterman and asked her about her suspension.

92. Breiterman said only, "No comment."

93. There has been no investigation by Internal Affairs into who at USCP provided the details of Breiterman's suspension to Hess.

94. On July 29, 2015, Roll Call published a story that said a female Sergeant had been suspended for the gun incident.

95. This article referred to Breiterman as a "whistleblower."

96. During Congressional hearings into the abandoned gun incidents, one Congressman said he wanted whoever had been suspended to be protected as a whistleblower.

97. The Chief of USCP falsely told the Congressman that the female Sergeant had not been suspended, only "reassigned."

98. The Congressman asked for the name of this "whistleblower."

99. On August 10, 2015, Breiterman met with Shutters at USCP's OPR office, at his request, for a third interview as part of the ongoing investigation.

100. Shutters later requested any additional documents in Breiterman's possession.

101. Breiterman cooperated and delivered the requested documents to the Internal Affairs office on or about August 24, 2015.

102. Internal Affairs, through Shutters, made it known to Breiterman that it was investigating her for "improper" or "inappropriate" communications.

103. Breiterman's communications have been neither improper nor inappropriate.

104. Breiterman's USCP colleagues routinely engage in similar or more "improper" or "inappropriate" communications without investigation or discipline.

105. On August 26, 2015, Breiterman received an anonymous phone call at her home.

106. The caller said that a USCP officer, Special Agent Skylar Hand, "got into trouble" for statutory rape of a 16 year old girl at a wedding but was not charged.

107. The caller also said that USCP is aware of this but allowed the officer to keep his job.

108. The caller suggested the press should investigate and then hung up.

109. On September 9, 2015, Human Resources called Breiterman and told her that USCP was imposing the two-day suspension, without pay, that Breiterman had received (and appealed in February 2015) when she protested that female officers could not advance at USCP based only on merit.

110. Breiterman did not receive any formal paperwork or notice regarding the imposition of the two day unpaid suspension; Breiterman only received the phone call from Human Resources.

111. It violates USCP procedure only to call an employee and inform her that she is receiving a suspension; a written notice is required.

112. Since she appealed the suspension in February 2015, Breiterman should have received a written explanation accepting or denying her appeal prior to any imposition of a suspension.

113. On March 8, 2016, Breiterman, represented by counsel, attended a meeting with Deputy Chief Richard Rudd and other USCP officials at USCP headquarters.

114. During this meeting, Breiterman was issued a CP-535 Request for Disciplinary Action recommending her demotion from the rank of Sergeant to the rank of Private First Class as a conclusion to USCP's investigation.

115. Many other officers, every day, commit violations of USCP policy.

116. The vast majority of those violations go uninvestigated and unpunished.

117. As only one example, in or about August 2015, a USCP officer was involved in a domestic violence incident in which the officer's girlfriend shot at him with his USCP service weapon. The USCP offer was placed on administrative leave but returned to duty shortly (details).

118. One of the officers who abandoned their service weapon in one of the other incidents mentioned by Hess posted a photo of herself on Facebook at work and in uniform, a violation of USCP policy which went uninvestigated and unpunished.

119. But USCP recommended termination for a female officer who was subjected to two disciplinary actions for petty "infractions" during her probationary period, failing to meet uniform standards on one occasion and sitting on a retaining wall while watching over an emergency door that was being repainted on the other occasion.

120. On March 23, 2016, Breiterman appealed the recommendation that she be demoted.

121. On May 3, 2016, USCP denied her appeal and imposed the demotion.

### COUNT I
### Discrimination Based on Gender
### Congressional Accountability Act of 1995
### 2 U.S.C. § 1311

122. Breiterman hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

123. Breiterman is an "employee" as defined in 42 U.S.C. § 2000e(f) (Title VII).

124. Breiterman is a "covered employee" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(c).

125. USCP is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

126. USCP is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

127. USCP violated Title VII, as incorporated with respect to USCP by the Congressional Accountability Act (CAA), by discriminating against Breiterman, based on her sex, when it suspended her employment for more than ten months on June 22, 2015.

128. USCP violated Title VII, as incorporated with respect to USCP by the CAA, by discriminating against Breiterman, based on her sex, when, on September 9, 2016, it imposed the two-day suspension Breiterman had previously received – and appealed – for protesting USCP's gender discrimination without proper notice or determination of her appeal.

129. USCP violated Title VII, as incorporated with respect to USCP by the CAA, by discriminating against Breiterman, based on her sex, when, on March 8, 2016, it recommended her demotion from the rank of Sergeant to the rank of Private First Class, and on May 3, 2016 when it imposed the demotion.

130. USCP's stated reasons for suspending and demoting Breiterman are pretext for its unlawful gender discrimination.

131. Breiterman has exhausted her administrative remedies.

132. Breiterman sustained substantial monetary and non-monetary damages as the result of USCP's conduct.

## COUNT II
### Retaliation
### Congressional Accountability Act of 1995
### 2 U.S.C. § 1311

133. Breiterman hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

134. Breiterman is an "employee" as defined in 42 U.S.C. § 2000e(f) (Title VII).

135. Breiterman is a "covered employee" pursuant to the CAA.

136. USCP is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

137. USCP is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

138. USCP violated Title VII, as incorporated with respect to USCP by the Congressional Accountability Act (CAA), by retaliating against Breiterman, based on her prior protected activity protesting USCP's gender discrimination, when it suspended her employment for more than ten months on June 22, 2015.

139. USCP violated Title VII, as incorporated with respect to USCP by the CAA, by retaliating against Breiterman, based on her prior protected activity protesting USCP's gender discrimination, when, on September 9, 2016, it imposed the two-day suspension Breiterman had previously received – and appealed – without proper notice or determination of her appeal.

140. USCP violated Title VII, as incorporated with respect to USCP by the CAA, by retaliating against Breiterman, based on her prior protected activity protesting USCP's gender discrimination, when, on March 8, 2016, it recommended her demotion from the rank of Sergeant to the rank of Private First Class, and on May 3, 2016 when it imposed the demotion.

141. USCP's stated reasons for suspending and demoting Breiterman are pretext for its unlawful retaliation.

## COUNT II
### Retaliation
### Congressional Accountability Act of 1995
### 2 U.S.C. § 1311

133. Breiterman hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

134. Breiterman is an "employee" as defined in 42 U.S.C. § 2000e(f) (Title VII).

135. Breiterman is a "covered employee" pursuant to the CAA.

136. USCP is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

137. USCP is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

138. USCP violated Title VII, as incorporated with respect to USCP by the Congressional Accountability Act (CAA), by retaliating against Breiterman, based on her prior protected activity protesting USCP's gender discrimination, when it suspended her employment for more than ten months on June 22, 2015.

139. USCP violated Title VII, as incorporated with respect to USCP by the CAA, by retaliating against Breiterman, based on her prior protected activity protesting USCP's gender discrimination, when, on September 9, 2016, it imposed the two-day suspension Breiterman had previously received – and appealed – without proper notice or determination of her appeal.

140. USCP violated Title VII, as incorporated with respect to USCP by the CAA, by retaliating against Breiterman, based on her prior protected activity protesting USCP's gender discrimination, when, on March 8, 2016, it recommended her demotion from the rank of Sergeant to the rank of Private First Class, and on May 3, 2016 when it imposed the demotion.

141. USCP's stated reasons for suspending and demoting Breiterman are pretext for its unlawful retaliation.

142. Breiterman has exhausted her administrative remedies.

143. Breiterman sustained substantial monetary and non-monetary damages as the result of USCP's conduct.

## COUNT III
### Violations of First Amendment Constitutional Rights by Federal Actor
### First Amendment to the U.S. Constitution

144. Breiterman hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

145. USCP violated Breiterman's constitutional rights when it suspended and demoted Breiterman for exercising her right to free speech under the U.S. Constitution when she provided a photograph to the press of a loaded weapon left by a USCP officer in a public restroom.

146. Breiterman sent the photo to the press because she believed the matter involved serious issues of public safety and was of significant public concern.

147. As the direct and proximate result of USCP's intentional and willful conduct, Breiterman has sustained substantial damage to her good name, reputation, honor and integrity, and has sustained mental anguish and pecuniary loss.

148. As the result of USCP's actions, Breiterman is entitled to be reinstated to her former position, compensated for her lost income, and afforded compensatory damages and costs of litigation.

## PRAYER FOR RELIEF

Based on the foregoing, Breiterman respectfully requests that she be awarded the following relief against USCP:

a. Reinstatement or, in lieu thereof, full front pay, stock options and benefits;

  b. Economic damages for lost compensation and damages to Breiterman's career, reputation, and earning capacity in an amount to be determined at trial but in excess of $10,000;

  c. Compensatory damages, including but not limited to pain and suffering, emotional distress and reputational damage;

  d. Reasonable costs and experts' and attorneys' fees; and

  e. Any other such relief that the Court may deem just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

            Respectfully submitted,

            */s/ John T. Harrington*
            R. Scott Oswald
            DC Bar # 458859
            John T. Harrington
            DC Bar # 987659
            The Employment Law Group, P.C.
            888 17th Street, NW, 9th Floor
            Washington, DC  20006
            (202) 261-2830
            (202) 261-2835 (facsimile)
            soswald@employmentlawgroup.com
            tharrington@employmentlawgroup.com
            *Counsel for Plaintiff Jodi Breiterman*

Dated May 11, 2016