**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JODI BREITERMAN,<br>*Plaintiff*,<br>v.<br>UNITED STATES CAPITOL POLICE,<br>*Defendant*. | Civil Action No. 16-893 (TJK) |

**MEMORANDUM OPINION**

United States Capitol Police employee Jodi Breiterman sued USCP, alleging that her suspension and demotion resulted from unlawful gender discrimination and retaliation in violation of the Congressional Accountability Act and the First Amendment. USCP tells a different story, asserting that it suspended Breiterman for remarking to fellow employees that women had to "sleep with someone" to get ahead there, and that it demoted her for leaking a picture of an unattended USCP firearm to the press. In response, Breiterman largely admits to the conduct attributed to her but still claims that USCP singled her out because of her gender and in retaliation for her protected activity. USCP has moved for summary judgment. For the reasons explained below, the Court will grant its motion.

## I. Factual and Procedural Background

Breiterman is a private first class in the United States Capitol Police ("USCP"), where she has worked since 2002.[1] Defendant's Statement of Undisputed Facts ("Def's UF"), ECF No. 65-2 ¶¶ 73–74. At the time of the events underlying this suit, Breiterman was a sergeant, the lowest USCP rank considered management. *Id.* ¶¶ 8, 82.

---

[1] These facts are undisputed unless otherwise stated.

In February 2014, Breiterman submitted her preference for an open position in the Protective Services Bureau ("PSB"), Investigations Division, Intelligence Section. *Id.* ¶ 111. Breiterman says that a lieutenant in the Investigations Division called her and told her that she would get the job. *Id.* ¶ 112.  Deputy Chief Chad Thomas, head of the PSB, had in fact selected Breiterman as his top choice for the position, but he still had to meet with then-Assistant Chief Daniel Malloy and the other deputy chiefs before the selection could be completed. *Id.* ¶ 113. Assistant Chief Malloy, however, "vetoed" Breiterman's selection. *Id.* ¶¶ 113, 117.  Ultimately, Deputy Chief Thomas offered the job to his second choice, Sergeant Joliana Cobbin, even though Sergeant Cobbin had not specifically requested the Intelligence Section position. *Id.* ¶ 117.  Breiterman filed a Request for Counseling in May 2014, followed by a Request for Mediation in June 2014, with the USCP's Office of Compliance, alleging that she was not selected for the Intelligence Section job because of her race, in violation of the Congressional Accountability Act. *Id.* ¶¶ 124–25.  Breiterman is white and Sergeant Cobbin and Assistant Chief Malloy are both African-American.  Def's Ex. 2, Attach. 1, ECF No. 65-4 at 140:18–141:4.  Breiterman chose not to pursue her claim further following mediation.  Def's UF ¶ 130.

Also in May or June 2014, Breiterman, while talking with administrative staff and a sergeant, made a comment about a female private first class she believed was "transferred . . . to a specialty department due to her [romantic] relationship with [a] Deputy Chief."  Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl's Opp."), ECF No. 66 at 18; Def's UF ¶¶ 133–34, 139.  During that conversation, she said something to the effect of, "You have to sleep with someone to get ahead in the department."  Pl's Opp. at 18; Def's UF ¶ 134. The private first class learned about Breiterman's comments and filed a complaint with the

USCP's Office of Professional Responsibility ("OPR").  Def's UF ¶¶ 138–39.[2]  Then-Sergeant

Mark Shutters investigated the complaint and interviewed Breiterman, the others present during

her alleged remark, and the complainant.  *Id.* ¶ 139.  Breiterman admitted to commenting

negatively on the complainant's transfer and to saying something like "in order to get ahead you

got to sleep with someone around here" or "you have to sleep with someone to get ahead."  *Id.*

¶ 141.  At the end of the investigation, OPR sustained a charge of violating Rule C10 of the

USCP Rules of Conduct, Improper Remarks, a rule which prohibits employees from making

"malicious, harassing, untruthful, or frivolous remarks or rumors against, or about, other

members of the Department or individuals in the workplace."  *Id.* ¶ 146; Def's Ex. 2, Attach. 2,

ECF No. 65-5, Ex. 3 at 6.  Consistent with USCP policy, OPR forwarded its report to the

assistant commander for review, who approved it and sent it on to the commander, who in turn

approved it and sent it to a disciplinary review officer for legal sufficiency review and penalty

assessment.  Def's UF ¶¶ 41, 43, 46–47, 147.  Deputy General Counsel ("DGC") Thomas

DiBiase, head of the Disciplinary Review Office, recommended a two-day suspension without

pay for Breiterman.  *Id.* ¶¶ 48, 147; *see* Def's Ex. 2, Attach. 6, ECF No. 65-6 at 125:4–7.  The

recommendation was then sent to Deputy Chief Thomas, Breiterman's bureau commander, who

USCP asserts approved it.  Def's UF ¶¶ 151, 153.[3]

---

[2] Although Breiterman disputes Defendant's Undisputed Fact ¶ 138, she does not appear to
dispute the portion of it that states that the private first class filed a complaint about Breiterman's
comments with OPR.  *See* Plaintiff's Statement of Disputed Material Facts ("Pl's DF"), ECF No.
66-2 at 52.

[3] Again, Breiterman disputes Defendant's Undisputed Facts ¶¶ 151 and 153, but she does not
appear to dispute that Deputy Chief Thomas received the penalty recommendation, and she
provides no evidence to counter USCP's assertion that he approved it.  Pl's DF at 54–55; *see
also* Pl's Ex. 37, ECF No. 66-39 at 22:4–25:10, 37:22–38:17 (Deputy Chief Thomas's testimony
about his consideration of the disciplinary recommendation).

Although Breiterman admitted to saying what she was accused of, she felt that the discipline proposed was too harsh because what she said was true—that is to say, female officers *do* have to sleep with male officers to get ahead—and no one ever investigated her statement's truthfulness.  Pl's Opp. at 18–19; Plaintiff's Statement of Disputed Material Facts ("Pl's DF"), ECF No. 66-2 at 54–55.  As a result, she appealed her suspension to then-Deputy Chief Matthew Verderosa, who was commander of the Disciplinary Review Task Force, as too harsh and inconsistent with progressive discipline.  Pl's Opp. at 19; Def's UF ¶¶ 155, 158.  Her appeal was denied, as was a second appeal to then-Chief Kim Dine, and Breiterman ultimately served her two-day suspension on September 27 and 28, 2015.  Pl's Opp. at 19; Def's UF ¶¶ 155, 159, 170, 172.

Even before Breiterman served her suspension, though, the events leading to her *demotion* were already underway.  On January 29, 2015, she responded to a call that a congressional staffer had found an unsecured firearm in a men's bathroom in an area of the Capitol Visitor Center restricted to authorized personnel.  Def's UF ¶¶ 173–74.  Breiterman, along with several other USCP employees, reported to the scene and began investigating.  *Id.* ¶¶ 175–76.  While doing so, Breiterman photographed the firearm on her work phone and determined that the firearm was USCP-issued.  *Id.* ¶¶ 177–78.  She secured it, and the USCP officer to whom it belonged was allowed to retrieve it.  *Id.* ¶ 179.  According to Breiterman, she saw the officer with it a few days later, which she thought was inappropriate because in her view, he had created a serious safety risk that merited a disciplinary investigation.  *See* Pl's Opp. at 20; Def's UF ¶¶ 181–83.  But USCP *did* undertake such an investigation, and the agent was ultimately suspended for six days without pay.  *See* Pl's Opp. at 8, 20; Pl's Ex. 2, ECF No. 66-4 at 42:3–43:1.

What came next, though, was what landed Breiterman in more trouble.  A few months later, on May 1, 2015, Roll Call reporter Hannah Hess published an article titled "Capitol Police Left Guns in Bathrooms," with the picture Breiterman had taken reprinted prominently under the headline.  *See* Pl's Opp. at 21; Def's UF ¶ 192.  The article was critical of USCP.  It discussed the January incident as well as two similar incidents, including one in which a seven- or eight-year-old child allegedly found a loaded firearm in a bathroom of the suite belonging to the Speaker of the House of Representatives.  Def's Ex. 6, ECF No. 65-10.  The article stated that no one knew how often such incidents occur because USCP does not disclose them, and reported that the "Jan[uary] 29 incident went out over the radio system, but the other two have been kept quiet, based on conversations with nine Capitol Police employees from various divisions, who spoke on the condition of anonymity to discuss internal issues.  None seem surprised, and two offered other examples of officers who were investigated for leaving their guns unsecured or unattended."  *Id.*  The article also reported that OPR recommended a six-day suspension of the officer at fault in the January 29 incident, and that the other two were still under investigation.  *Id.*  Later that day, Hess published a follow-up piece titled "Do Capitol Police Problems Go Beyond the Bathroom?" which similarly featured the photo Breiterman had taken and was again critical of USCP.  Def's Ex. 7, ECF No. 65-11; Def's UF ¶ 197.  According to USCP, the articles created a "media frenzy" in which "the Department, its leaders, and its officers were the subject of intense public scrutiny and negative media coverage," including several critical national and international news articles, a congressional hearing, and even a skit on Jimmy Kimmel Live! titled "Potty Training."  Def's UF ¶¶ 199–201; Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Def's Br."), ECF No. 65-1 at 2.

USCP investigated who leaked the photo of the firearm, and quickly determined that it was probably Breiterman. Def's UF ¶¶ 206, 209. The next month, Sergeant Shutters interviewed Breiterman in connection with this investigation; the interview lasted for about two hours and fifteen minutes. *Id.* ¶ 211; Def's Ex. 3, Declaration of Mark S. Shutters ("Shutters Decl."), ECF No. 65-7 ¶ 22. The parties' accounts of this interview differ somewhat. According to USCP, Breiterman was not forthcoming about having sent the photo to Hess, and she twice denied having sent it to anyone outside USCP, only to turn around and admit to it after being confronted with evidence implicating her and threatened with a polygraph. Def's UF ¶¶ 213–17; Shutters Decl. ¶¶ 15–16. Breiterman agrees that she "admitted" sending the photo to Hess, but she does not think she first denied doing so. Pl's DF at 65; Pl's Ex. 6, ECF No. 66-8 at 219:20–220:4; Def's Ex. 2, Attach. 1 at 236:3–237:20. In any event, the parties agree that Breiterman also admitted to speaking with Hess about the circumstances of the January 29 incident. Def's UF ¶¶ 218–20.

The parties also dispute how Breiterman characterized her motives during the interview. USCP claims that Breiterman said that she "did not know why" she sent the photo to Hess, that she "just was not thinking," and that it was a "stupid decision." *Id.* ¶ 223. USCP also asserts that Breiterman said that she understood that she did not have the authority to share the photo and other information, and that it was a violation of USCP policy to have done so. *Id.* ¶ 224. Breiterman provided a written statement at the end of the interview in which she wrote: "I made a poor decision to send the picture. This was department information." *Id.* ¶ 225. Citing Breiterman's own deposition testimony, USCP claims that it was only many months later that she claimed to be motivated by public safety. *Id.* ¶ 231; Def's Br. at 40–41; Def's Ex. 2, Attach. 1 at 243:13–244:17; *see also* Def's Ex. 5, Declaration of Scharon L. Ball ("Ball Decl."), ECF

No. 70-4 (sealed), ECF No. 80-2 (redacted version), Attach. 1 at 2–3 (disciplinary memorandum in Breiterman's case alleging that she informed USCP in November 2015, over four months after her original interview, that she sent the photo to Hess out of concern for public safety).[4] Breiterman disputes USCP's characterization of her motives without contradicting the evidence it cites. She asserts that she spoke out to protect the public because she was alarmed by repeated instances of USCP officers leaving loaded firearms unattended in public places. Pl's Opp. at 19–21, 44; Pl's DF at 61–63.

At the close of her OPR interview, USCP revoked Breiterman's police powers and placed her on paid administrative leave. Def's UF ¶ 232; Pl's Opp. at 23–24. Later, USCP broadened its investigation to include Breiterman's communications with other USCP supervisory officials, but the parties dispute how and why that happened. According to USCP, it confiscated and searched Breiterman's USCP-issued phone because Breiterman used it to take the picture she sent to Hess. Def's UF ¶ 233. Upon examination of the device, USCP allegedly found potentially improper communications between Breiterman and an inspector in which Breiterman made disparaging remarks about USCP management, as well as similar potentially improper disparaging comments and "flirtatious" communications between Breiterman and a captain to whom she reported. *Id.* ¶¶ 234–38. Breiterman argues that USCP went through her emails and texts as part of a "fishing expedition" prompted by discriminatory and retaliatory animus. *See* Pl's Opp. at 21–25; Pl's DF at 74–87.

[4] Completing her about-face, in her deposition, Breiterman also suggested that she had not done anything wrong by providing the information to Hess because she could "speak to her as an associate," and that she did not know there had been an investigation into what had happened on January 29 that would have been covered by certain provisions of the USCP media policy. Pl's Ex. 17, ECF No. 67-11 (sealed), ECF No. 79-1 (redacted version) at 228:21–232:8.

OPR interviewed Breiterman twice more that year in connection with the leak investigation. The second interview, a few months later in August, was initiated to discuss the messages at issue, and specifically to determine whether the inspector was also involved in leaking information to Hess. Shutters Decl. ¶¶ 23–27. The third interview, in November, took place in response to a letter from Breiterman's counsel in which she asserted—for the first time—that she had exercised her First Amendment free speech rights in sending the picture to Hess. *Id.* ¶¶ 28–30.

In September 2015, OPR issued a Report of Investigation ("ROI") finding that Breiterman had violated USCP Rule C1: Conduct Unbecoming. Shutters Decl., Attach. 4, ECF No. 70-2 (sealed), ECF No. 80-1 (redacted version); *see* Def's Ex. 2, Attach. 2, Ex. 3 at 5. OPR forwarded its ROI to DGC DiBiase, who reviewed it and assigned it to a disciplinary review officer, Senior Counsel Scharon Ball, for a penalty assessment. Def's UF ¶ 241. In November of that year, Ball wrote a memorandum recommending that Breiterman be demoted. Ball Decl., Attach. 1. In so deciding, Ball considered "the nature and seriousness of the offense, Breiterman's employment history, mitigating factors, and penalties issued in cases involving similar circumstances." *Id.* ¶ 11. Then-Assistant Chief Verderosa, DGC DiBiase, and Deputy Chief Thomas testified that USCP, per its collective bargaining agreement (CBA), uses those factors to evaluate discipline for all employees. Def's Ex. 2, Attach. 2, ECF No. 65-4 at 24:5–12; *id.*, Attach. 4, ECF No. 65-5 at 37:7–22, 47:9–16; *id.*, Attach. 6 at 37:8–21.

In Ball's view, most of these factors cut against Breiterman and none cut in her favor. She found Breiterman's conduct "very serious" with "no mitigating factors," and found no similar cases involving supervisory officials within a two-year period. Ball Decl., Attach. 1 at 5.

In particular, Ball weighed heavily Breiterman's knowing violation of USCP media policy;[5] she determined that Breiterman's belated claim that she did not violate that policy was belied by her request for anonymity to Hess.[6] *Id.* Ball also rejected Breiterman's post-hoc assertion that she had acted out of concern for public safety, calling it "nonsensical" because there was no immediate emergency when Breiterman spoke to Hess. *Id.* Ball also gave significant weight to the media attention Breiterman's actions attracted, noting that she "tarnished the reputation of the Department," fostered distrust between it and Congress, and "exposed the Department to significant ridicule and damaging publicity." *Id.* at 6. Ball concluded that Breiterman provided Hess with the photo to "embarrass the Department and bring disrepute on other Department law enforcement officers and officials." *Id.* at 5. Turning to Breiterman's text messages, Ball found that the inappropriate and flirtatious texts Breiterman exchanged with a captain in her chain-of-command brought disrepute on herself and reinforced her lack of good judgment. *Id.* at 6.

Finally, Breiterman's substantial disciplinary record also played a part in Ball's recommendation. USCP issues two kinds of discipline: CP-534s, which cover less serious violations and include penalties from a written warning up to loss of 24 hours of leave, and CP-535s, which cover more serious violations and include penalties from a one-day suspension

[5] The USCP media policy requires, among other things, employees to "refer all media inquiries concerning the Department to the [Public Information Officer] or, when the [Public Information Officer] is not on duty, to the Watch Commander." Def's Ex. 2, Attach. 2, Ex. 2 at 2. OPR's ROI found that Breiterman had violated this provision of the policy. Shutters Decl., Attach. 4 at 5. It also prohibits employees from putting "evidence that is in Department custody on public display without the express consent of the Chief of Police." Def's Ex. 2, Attach. 2, Ex. 2 at 2.

[6] Breiterman purports to dispute that she asked Hess to keep her anonymous, Pl's DF at 67, but she confirmed that she did in her deposition, Def's Ex. 2, Attach. 1 at 224:10–13, and in her written statement to Sergeant Shutters, Shutters Decl., Attach. 3.

without pay up to termination. Def's UF ¶ 54; Def's Ex. 2, Attach. 2 at 13:16–14:1; *id.*, Attach. 4 at 75:1–4. Breiterman's record consisted of four violations, two CP-534s and two CP-535s, including a serious violation related to her truthfulness which led to a 15-day suspension and would have to be disclosed if Breiterman ever had to testify in court.[7] Ball Decl., Attach. 1 at 6–7. In sum, Ball found that Breiterman had "engaged in a pattern of repeatedly violating Department policies and cannot be trusted to set a good example for subordinates," and thus recommended demotion. *Id.* at 7.

In accordance with USCP policy, DGC DiBiase then forwarded Ball's recommendation to Deputy Chief Thomas. Def's UF ¶ 248. Deputy Chief Thomas disagreed with both the form and substance of Ball's recommendation. He thought that rather than one broad charge of Conduct Unbecoming, multiple, more specific charges were more appropriate. *Id.* ¶ 249; Def's Ex. 2, Attach. 6 at 123:15–125:3. More importantly, he disagreed with the recommended penalty of demotion, and instead proposed what he thought to be the "lesser penalty" of "a serious suspension of some number of days." Def's Ex. 2, Attach. 6 at 125:16–126:12; Def's UF ¶ 250.

Because Deputy Chief Thomas and DGC DiBiase were unable to reach an agreement on the proposed penalty, in accordance with USCP policy, they met with Assistant Chief Verderosa to decide how Breiterman's case would be handled. Def's UF ¶¶ 251–52. According to Assistant Chief Verderosa, he considered the four factors identified in the CBA, Ball's memorandum, and input from Deputy Chief Thomas in evaluating suspension, demotion, or

[7] DGC DiBiase testified that a truthfulness violation is ordinarily grounds for termination. Def's Ex. 2, Attach. 4 at 131:7–12. Similarly, Deputy Chief Thomas testified that a truthfulness violation is "a fairly serious offense" for which USCP has terminated people in the past. *Id.*, Attach. 6 at 38:18–22; *see also* Def's UF ¶ 102 (stating USCP's position that a sustained truthfulness charge is "ordinarily grounds for termination from the Department").

termination as potential penalties.  Def's Ex. 2, Attach. 2 at 162:1–164:12.  He says that he felt Breiterman had lost the trust of her subordinates because they might feel that should they make a mistake, it could end up in the media, and for that reason she could not return to work in a supervisory capacity.  *See id.*  And because he felt that Breiterman's disciplinary record was "egregious" in some respects and "seems to be getting since the first instance progressively worse," he seriously considered termination.  *Id.*  But because USCP had punished Breiterman's most recent disciplinary violation with a two-day suspension, he felt it more consistent with progressive discipline to recommend demotion, the penalty USCP ultimately meted out.  *Id.* at 163:16–164:2.

Thus, about ten months after its investigation began, USCP found Breiterman in violation of its Conduct Unbecoming rule for her leaking of the firearm photo and her communications with Hess—as well as her communications with the inspector and captain—and recommended her demotion from sergeant to private first class.  *See* Def's UF ¶ 258; Pl's Opp. at 26–27; ECF No. 17 ¶¶ 112–13.  Breiterman unsuccessfully appealed, and after she exhausted USCP's administrative process, she was demoted in May 2016.  Def's UF ¶¶ 259–62.[8]

Breiterman filed a Request for Counseling under the Congressional Accountability Act, challenging her two-day suspension (for Improper Remarks) and her placement on administrative leave (during the investigation into the Roll Call leak) as unlawful gender discrimination and retaliation in October 2015, and then filed a Request for Mediation of those claims in November 2015.  *Id.* ¶ 263.  The mediation period ended in February 2016.  *Id.*

---

[8] Breiterman purports to dispute Defendant's Undisputed Facts ¶¶ 260–61, which state that her appeal was rejected and describe and quote verbatim from that denial.  *Compare* Def's UF ¶¶ 260–61, *with* Def's Ex. 4, Declaration of Thomas A. DiBiase ("DiBiase Decl."), ECF No. 65-8, Attach. 5.  Her objection is therefore unfounded.

Breiterman then filed a Request for Counseling, challenging her demotion as unlawful gender discrimination and retaliation, in March 2016 and a Request for Mediation in May 2016. *Id.* ¶ 264. The mediation period for those claims ended in June 2016. *Id.* Breiterman filed this suit in May 2016 and the operative Second Amended Complaint in January 2017. ECF No. 1; ECF No. 17. She moved for partial summary judgment on two of USCP's affirmative defenses in January 2018; the Court granted her motion in July 2018. ECF No. 47; ECF No. 64. Now pending is USCP's Motion for Summary Judgment, ECF No. 65.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). To survive summary judgment, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation omitted). "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). Courts "are not to make credibility determinations or weigh the evidence." *Lopez*, 826 F.3d at 496 (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). But the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

"The movant bears the initial burden of demonstrating that there is no genuine issue of material fact." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Id.* And for claims where the non-movant bears the burden of proof at trial, as here, she must make an evidentiary showing "sufficient to establish the existence of [each] element essential to [her] case." *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and therefore entitles the moving party to "judgment as a matter of law." *Id.* at 323. "Importantly, while summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 17 (D.D.C. 2009) (cleaned up).

## III. Analysis

The Congressional Accountability Act (CAA), 2 U.S.C. § 1301 *et seq.*, applies the protections of Title VII of the Civil Rights Act to covered legislative employees, and as such requires that "[a]ll personnel actions affecting covered employees shall be made free from any discrimination based on . . . race, color, religion, sex, or national origin." 2 U.S.C. § 1311; *Blackmon-Malloy v. United States Capitol Police Bd.*, 575 F.3d 699, 701 (D.C. Cir. 2009). The CAA, like Title VII, also prohibits an employer from retaliating against an employee for the employee's statutorily protected activity. *See Newton v. Office of the Architect of the Capitol*, 840 F. Supp. 2d 384, 398 (D.D.C. 2012). Claims under the CAA are analyzed under case law

interpreting Title VII, including the familiar burden-shifting framework set out by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Harrison v. Office of the Architect of the Capitol*, 964 F. Supp. 2d 81, 96 (D.D.C. 2013).

A plaintiff may show impermissible discrimination either based on direct evidence which "itself shows . . . bias in the employment decision," *Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) (alteration in original) (quoting *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)), or circumstantial evidence that the decision was motivated by discriminatory intent, *Vasquez-Mills v. District of Columbia*, 278 F. Supp. 3d 167, 174 (D.D.C. 2017). In the latter case, the *McDonnell Douglas* framework applies. *Id.* First, the plaintiff bears the burden of establishing her prima facie case. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). Then, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for its action." *Id.* at 1114. If the employer does so, the burden shifts to the plaintiff to show that the employer's reason was in fact a pretext for unlawful discrimination. *Id.* On a motion for summary judgment where the employer has offered a legitimate reason for its actions, however, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (Kavanaugh, J.). Rather, the Court skips ahead to the third part of the test to determine whether the plaintiff has provided sufficient evidence for a reasonable jury to conclude that the employer's explanation is pretextual. *See Wheeler*, 812 F.3d at 1114.

Similarly, the *McDonnell Douglas* framework governs retaliation claims based on circumstantial evidence. *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014). In such cases, the plaintiff must establish her prima facie case by showing "(1) that [s]he engaged in statutorily

protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Massaquoi v. District of Columbia*, 285 F. Supp. 3d 82, 87 (D.D.C. 2018). The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for its action, which shifts the burden back to the plaintiff to produce evidence sufficient to create a genuine dispute of material fact as to whether the employer's proffered reason is a pretext for unlawful retaliation. *See id.*

**A. Gender Discrimination and Retaliation—Breiterman's Two-Day Suspension**

Breiterman first argues that her two-day suspension for Improper Remarks was motivated by gender discrimination and retaliation for her EEO complaint alleging racial discrimination in the selection of an officer to fill the Intelligence Section vacancy. As described above, USCP argues that it suspended Breiterman because she violated the improper remarks policy when she disparaged a private first class's transfer in front of other USCP employees by insinuating that she was transferred only because she had a relationship with a deputy chief, and by suggesting that women have to sleep with someone in USCP to get ahead. *See* Def's Br. at 7–11. While Breiterman largely admits to this conduct, she argues that the real reason she was disciplined so harshly was illegal gender discrimination and retaliation. *See* Pl's Opp. at 18–19, 29, 34, 42–43.

Although Breiterman claims that her suspension resulted from gender discrimination, she presents no argument on this point. Rather, she directs almost her entire gender discrimination argument at her demotion. *See id.* at 28–42. For example, all her comparator and procedural irregularity evidence relates to her demotion claim, not her suspension claim. *See, e.g.*, *id.* at 36–42 (discussing alleged irregularities in USCP's investigation into the Roll Call incident and its decision to demote her). Thus, Breiterman has offered no evidence to support her claim that USCP's real motive in suspending her was gender discrimination, and so the Court will grant USCP summary judgment on that issue.

Her retaliation claim related to her suspension fares little better. "An employee can create a material dispute on the issue of retaliation through a combination of '(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of [retaliation] that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.'" *Moran v. United States Capitol Police*, 82 F. Supp. 3d 117, 126 (D.D.C. 2015) (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)). Breiterman's only evidence of retaliation is that Sergeant Shutters, who conducted her OPR interview in the case that ultimately led to her suspension, knew that she had filed a prior EEO complaint alleging racial discrimination. Pl's Opp. at 42–43.

The problem for Breiterman is that Sergeant Shutters's knowledge of her prior EEO complaint does not causally connect the complaint and her suspension, a deficiency which "can be sufficient to preclude [the] plaintiff from establishing pretext at the summary judgment stage." *Moran*, 82 F. Supp. 3d at 127. OPR's and Sergeant Shutters's role was to investigate that incident and determine whether a violation occurred. *See* Pl's Opp. at 18; Def's UF ¶ 139; Shutters Decl., Attach. 2, ECF No. 70-2 (sealed), ECF No. 80-1 (redacted version) (ROI). OPR had no role at all in determining or imposing a penalty. Def's UF ¶ 40. And notably, it is only the penalty that Breiterman challenges—she does not dispute USCP's characterization of the facts. *See* Pl's DF at 55 ("Breiterman appealed her two-day suspension because she thought the discipline was too harsh."); Def's UF ¶ 158.

Nor does Breiterman identify any issues with Sergeant Shutters's investigation which could have tainted the rest of the process. *See Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015) (discussing the "cat's-paw" theory of liability). Indeed, according to her own account,

Sergeant Shutters determined that the initial allegations about what Breiterman said were "inaccurate and exaggerated."  Pl's DF at 51–52.  Breiterman complains that Sergeant Shutters did not investigate whether her allegations were true, but he testified that such an inquiry was not within the scope of the complaint he was tasked to investigate.  Pl's Ex. 6 at 153:20–157:11.  And finally, Breiterman concedes that Deputy Chief Thomas, who approved Ball's recommendation of a two-day suspension, and then-Deputy Chief Verderosa, who denied Breiterman's first appeal, did not know about her prior EEO complaint.[9]  Def's UF ¶¶ 131–32, 155, 159.  Breiterman thus fails to explain how Sergeant Shutters's knowledge of her prior complaint could have caused USCP to retaliate against her by suspending her.[10]

---

[9] Neither party asserts that DGC DiBiase or Ball knew of Breiterman's prior EEO complaint.

[10] USCP concedes that then-Chief Dine knew of Breiterman's EEO complaint because she disclosed it to him when she appealed her suspension.  Def's Br. at 34; *see* Def's Ex. 2, Attach. 1, Ex. 6 at 2.  But Breiterman does not argue that *her own disclosure* of her complaint caused Chief Dine to retaliate against her, and she is wise not to press the point.  Although Chief Dine affirmed her suspension, it had been assessed and affirmed on appeal by officials with no knowledge of her EEO complaint.  And her appeal letter refers merely to having "attempted to address [her] concerns" with the Office of Compliance.  Def's Ex. 2, Attach. 1, Ex. 6 at 2.  The letter provides no details about what kind of EEO complaint she filed or how far it progressed.  None of this creates a genuine issue of material fact about whether Chief Dine retaliated against Breiterman by denying her second appeal of a suspension.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (holding that a plaintiff must establish that her protected activity was a but-for cause of the adverse employment action).  Finally, to show a causal connection based on the employer's knowledge of the employee's protected activity without other evidence of retaliation, the employee must *also* show that "the adverse personnel action took place shortly after that activity."  *Holcomb*, 433 F.3d at 903.  Breiterman filed her EEO complaint in May 2014.  Def's UF ¶¶ 124–25.  Chief Dine did not deny her appeal until over a year later, in July 2015.  DiBiase Decl., Attach. 3.  This fourteen-month delay is too long to support an inference of retaliation.  *See, e.g.*, *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action taken . . . 20 months later suggests, by itself, no causality at all"); *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 86 (D.D.C. 2013) (rejecting an inference of causation from temporal proximities of four and six months).

Breiterman has failed to create a genuine dispute of material fact as to whether USCP's explanation for her suspension is a pretext for unlawful retaliation.  Thus, the Court will grant USCP's motion as to this claim.

**B.    Gender Discrimination and Retaliation—Breiterman's Placement on Administrative Leave and Demotion**

Breiterman's claims about the discipline imposed on her because she leaked the firearm photo to Hess at Roll Call are more complicated to unpack.  She argues that USCP disciplined her "more severely than male officers who engaged in worse conduct," and that procedural irregularities in the investigation of her case show discriminatory animus by USCP.  Pl's Opp. at 29; *see id.* at 36–41.  She also claims that USCP retaliated against her in violation of the CAA and because of her exercise of protected speech in violation of the First Amendment.  Ultimately, though, she does not rebut USCP's asserted legitimate, nondiscriminatory reasons for placing her on leave and demoting her such that she raises a genuine dispute of material fact, and she also fails to make out a claim of First Amendment retaliation.

**1.    Gender Discrimination**

**a.    Comparator Evidence**

Breiterman points to many male comparators whom she claims engaged in similar or more severe conduct and whom USCP disciplined less harshly.  And to be sure, an employer's more favorable treatment of similarly situated employees who do not share the plaintiff's protected characteristic can provide evidence of unlawful discrimination.  *Wheeler*, 812 F.3d at 1115.  But comparator evidence is subject to a high bar.  "For a plaintiff to prove that she is similarly situated to another employee, she must demonstrate that she and the alleged similarly-situated employee 'were charged with offenses of comparable seriousness,' and 'that all of the relevant aspects of [her] employment situation were nearly identical to those of the other

employee.'"  *Id.* at 1115–16 (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301

(D.C. Cir. 2015)) (alteration in original).  "Factors that bear on whether someone is an

appropriate comparator include the similarity of the plaintiff's and the putative comparator's job

and job duties, whether they were disciplined by the same supervisor, and, in cases involving

discipline, the similarity of their offenses."  *Id.* at 1116 (quoting *Burley*, 801 F.3d at 301).

Breiterman describes eighteen male comparators, but she makes little effort to explain

how they are similarly situated to her.  *See* Pl's Opp. at 7–15.  And indeed, most of them are not

even close.  To begin with, most of her purported comparators are rank-and-file officers rather

than supervisory officials, a crucial difference.  *See Wheeler*, 812 F.3d at 1116.  Assistant Chief

Verderosa, Deputy Chief Thomas, and DGC DiBiase all represent that because supervisory

officials have more authority than officers, USCP holds them to a higher standard and disciplines

them more harshly than officers who commit similar offenses.  *See, e.g.*, Def's Ex. 1, Declaration

of Matthew R. Verderosa ("Verderosa Decl."), ECF No. 65-3 at ¶ 7; Def's Ex. 2, Attach. 3, ECF

No. 65-5 at 16:2–11, 62:6–18; *id.*, Attach. 4 at 129:10–13.  And, consistent with USCP's

representations, disciplinary documents for each of the supervisor-comparators cite their

supervisory status as an aggravating factor.  *See* Def's Ex. 9, Declaration of Thomas A. DiBiase

("Second DiBiase Decl."), ECF No. 70-5 (sealed), ECF No. 80-3 (redacted version) at ¶¶ 18, 49,

53, 56, Attach. 10 at 2, Attach. 22 at 3–4, Attach. 24 at 2–3.

Although Breiterman argues that USCP does not consistently consider rank in imposing

discipline, her support for this argument rests on examples in which USCP allegedly failed to

address rank in terms of differentiating between different supervisory levels, rather than between

officers and supervisors as a group.  Pl's Opp. at 30–31.  Other than a conclusory statement that

"USCP's disciplinary records are largely void of discussions as to how an employee's rank

factors into discipline," she makes no argument that in weighing discipline, USCP does not consider that an employee is a supervisor—rather than a rank-and-file officer—and she points to no evidence to rebut USCP's representations on this point. *Id.* at 30. Because officers do not have the same job title or responsibilities and the unrebutted evidence shows that USCP considers supervisory status in determining discipline, Breiterman's purported officer-comparators are not similarly situated to her. *Cf. Washington v. Wash. Metro. Area Transit Auth.*, 330 F. Supp. 3d 232, 244 (D.D.C. 2018) (finding that a transit police officer's purported comparators were not similarly situated because "[t]heir conduct differed from hers in a key respect: not one engaged in conduct that called into question his ability to perform a sergeant's supervisory duties").[11]

Excluding rank-and-file officers leaves Breiterman with three supervisory officials as potential comparators, but none helps her show an inference of unlawful discrimination. In one case, a male official with the rank of commander ("Comparator 1") sent suggestive text messages to a female subordinate, inviting her up to his hotel room while they were on official travel. Def's Ex. 8, Attach. 1, ECF No. 68-1 at 89:11–90:18; Pl's Ex. 22, ECF No. 67-16 (sealed) at 15–16. Comparator 1 violated USCP's anti-discrimination/anti-harassment policy and received a 20-day suspension, split over two months, with five days held in abeyance on appeal. Pl's Ex. 24, ECF No. 67-18 (sealed) at 3. The other two supervisor-comparators were

[11] Indeed, Breiterman's own arguments show why, even on her terms, rank-and-file officers are inappropriate comparators in her case. She argues that USCP disciplined her more harshly than other employees who committed similar offenses, in part because she was demoted, even though discipline more severe than a 30-day suspension is rare. Pl's Opp. at 36. But all non-supervisory officers are ranked private first class, and there is no rank below that to which they *could* be demoted. Def's Ex. 2, Attach. 4 at 125:16–126:11; Def's UF ¶¶ 55–56.

punished for a common incident. In that case, the two comparators and another individual, while on duty, altered a series of photos to mock high-ranking USCP officials in what was intended as an office joke.[12] *See* Pl's Opp. at 13–14; Defendant's Reply in Support of Motion for Summary Judgment ("Def's Reply"), ECF No. 68 at 6. Besides mocking USCP officials, the altered images made fun of the deaf, illegal immigrants, and transgender people. *See* Pl's Ex. 34, ECF No. 67-28 (sealed). "Comparator 2," a commander, received two CP-535s for his role in creating at least nine of the photos and receiving others—one for Conduct Unbecoming and one for contravening USCP's harassment policy. *Id.* at 1. Comparator 2 was given a thirteen-day suspension, with eight of those days held in abeyance on appeal. *Id.* at 5. "Comparator 3" also received two CP-535s, one for Conduct Unbecoming and one for Subordinate Compliance. Pl's Ex. 35, ECF No. 67-29 (sealed) at 1. Comparator 3 is a "high-ranking Department commander" who supervised the two employees who created the photos, and he was disciplined for condoning and encouraging the misconduct rather than stopping it. *See id.*at 1–2; Second DiBiase Decl. ¶ 50. Comparator 3 was assessed a fourteen-day suspension, with eight days held in abeyance on appeal. Pl's Ex. 35 at 4.

These three potential comparators are indeed male supervisory officials who received more lenient punishment than Breiterman. But they are not similarly situated to her because they

[12] Breiterman's brief is not a model of clarity on this point. She appears to reference four individuals who were involved in this incident, but on closer inspection, the "male ranking officer" appears to be the same person as the "Inspector/Division Commander" she references, referred to as "M109" in USCP materials, and the "male commander" the same person as the "male officer," referred to as "M69" in USCP materials. Pl's Opp. at 14; *see* Pl's Ex. 9, ECF No. 67-4 (sealed) at 118:2–22. Adding to the confusion, it appears that three individuals were in fact involved in the incident, *see* Pl's Ex. 9 at 118:2–22, and USCP seems to have assumed that Breiterman was holding up all three as potential comparators. *See* Defendant's Reply in Support of Motion for Summary Judgment, ("Def's Reply"), ECF No. 68 at 6. Because Breiterman does not argue that the individual USCP identifies as "Comparator 22" in its brief is a potential comparator, the Court will not consider him as such.

do not have similar disciplinary histories. *See Duru v. District of Columbia*, 303 F. Supp. 3d 63, 74 (D.D.C. 2018). As mentioned above, disciplinary history is one of four factors which USCP considers in each case. Breiterman argues that disciplinary history is not an appropriate factor for the Court to consider because USCP does not consistently consider prior discipline. Pl's Opp. at 31–32. But she cites no evidence to support this conclusory statement or to rebut USCP's evidence to the contrary. And in any event, as detailed below, USCP *did* consider the prior disciplinary history of the three remaining comparators in assessing a penalty against them.

Comparator 1 had only one prior disciplinary violation, a CP-534 (the less serious form of discipline USCP issues) with an unspecified penalty over 20 years old. Pl's Ex. 24 at 2. Comparator 2 had three prior violations, but all of them were CP-534s. Pl's Ex. 34 at 4. The two most recent violations ultimately resulted only in warnings, and the third resulted in forfeiture of 8 hours of leave.[13] *Id.* Comparator 3 had no prior disciplinary history at all. Pl's Ex. 35 at 3.

By contrast, Breiterman had an extensive disciplinary history. Her record included a CP-535 for Truthfulness, Absence from Duty, and Compliance with Directives from a 2003 incident for which she was suspended for 15 days; a CP-534 for Insubordination, which resulted in her forfeiture of eight hours of leave; a CP-534 for Improper Remarks which led to her forfeiture of

---

[13] USCP represents that Comparator 2 (whom it calls Comparator 20) had only one prior disciplinary violation: the CP-534 that led to forfeiture of 8 hours of leave. *See* Def's Reply at 14; Second DiBiase Decl. ¶ 48. One of the documents they supply supports this characterization, and the Court surmises that violations which resulted only in warnings may not have counted against Comparator 2. Second DiBiase Decl., Attach. 23 at 3. Still, because one document lists the two prior CP-534s which led to warnings in Comparator 2's prior history, the Court, construing the facts in the light most favorable to Breiterman, will assume that Comparator 2 had three prior disciplinary violations. *See* Pl's Ex. 34 at 4.

another eight hours of leave; and her much more recent CP-535 for Improper Remarks arising from her comment that women at USCP have to sleep with someone to get ahead, for which she was suspended for two days. Def's Ex. 4, Declaration of Thomas A. DiBiase ("DiBiase Decl."), ECF No. 65-8, Attach. 5 at 4; Verderosa Decl., Attach. 1. In total, Breiterman had two CP-535s and two CP-534s.[14] Comparator 1 and Comparator 3 are not similarly situated to Breiterman because they had little or no prior disciplinary history and so would not have faced as severe a penalty for similar conduct. *See Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 74–75 (D.D.C. 2005). Comparator 2 presents a slightly closer question, but he ultimately fails as a comparator as well. Although Comparator 2 had three violations, all were CP-434s, two of which led to only a warning. By contrast, two of Breiterman's violations led to suspensions (including a long one); and her least serious penalty (forfeiture of eight hours of leave) was the same as Comparator 2's most serious penalty. Because Comparator 2's disciplinary history is materially less serious than Breiterman's, he too is not similarly situated to her.

Finally, Breiterman offers two more potential comparators: the inspector and captain with whom she exchanged allegedly inappropriate and flirtatious text messages. Sergeant Shutters's ROI found that Breiterman's text exchanges included "malicious, harassing, untruthful, and frivolous" remarks, Shutters Decl., Attach. 4 at 12–13, and Ball's memorandum found that

[14] USCP characterizes Breiterman's 2003 incident as leading to three separate CP-535s, one each for Truthfulness, Absence from Duty, and Compliance with Directives, which would bring her record to four CP-535s and two CP-534s. Def's UF ¶¶ 103–05; Def's Reply at 14. It provides some evidence to support this characterization. *See* Def's Ex. 2, ECF No. 70-1, Attach. 1, Ex. 1 (sealed) (referring to three CP-535s). Even so, because the disciplinary documents refer to "a CP-535" from this incident, the Court, construing the facts in the light most favorable to Breiterman, will assume that she received only one CP-535 from the 2003 incident. *See, e.g.*, DiBiase Decl., Attach. 5 at 4.

Breiterman violated USCP policy by showing contempt for USCP officials in those messages and creating the appearance of an improper relationship between herself and the captain, Ball Decl., Attach. 1 at 6.  Similarly, the memorandum denying her appeal discussed Breiterman's "inappropriate" communications.  DiBiase Decl., Attach. 5.  And yet, although the record reflects that the Office of the Inspector General ("OIG") was investigating the inspector's and captain's conduct, as of several years later, the investigation had not concluded.[15]  *See* Def's Reply at 12; Def's Ex. 2, Attach. 3 at 63:11–64:21; *id.*, Attach. 5, ECF No. 65-6 at 307:10–21. Breiterman argues that USCP's failure to discipline the two supervisors with whom she corresponded, when it demoted her in part for her role in the same conduct, suggests discrimination.  Pl's Opp. at 30.  The Court does find it troubling that USCP apparently considered Breiterman's role in the correspondence serious enough to factor into her demotion, but does not seem to be similarly concerned about the inspector's and captain's participation in the same exchanges.  And although there is no evidence in the record about how quickly OIG is expected to conduct investigations, OPR guidelines say that its investigations should be completed in 90 to 120 days—a far cry from the two-plus years for which the investigation into the captain and inspector was pending.  *See* Def's Ex. 2, Attach. 2 at 125:2–15; Pl's Ex. 6 at 318:22–319:3 (testimony of Sergeant Shutters that he has "no idea" how long an OIG investigation should take).

But ultimately, Breiterman's attempt to use the captain and inspector as comparators ignores the elephant in the room.  Although USCP broadened the scope of its investigation to include Breiterman's text messages, the focus of its investigation—and her punishment—was her

---

[15] OIG, rather than OPR, conducts investigations into supervisors above a certain rank.  *See* Def's Ex. 2, Attach. 3 at 16:2–17:13.

unauthorized disclosure of information and the photo she took to Hess. Breiterman does not suggest that the captain and inspector committed any similar misconduct, and there is no evidence they did. Because the "nature of the offenses committed" is one of the "most significant variables in a case alleging discrimination in connection with disciplinary actions," this distinction is fatal to Breiterman's argument about these two potential comparators. *Childs-Pierce*, 383 F. Supp. 2d at 70.

For these reasons, no reasonable jury could find that Breiterman's alleged comparators are similarly situated to her such that their cases suggest that USCP unlawfully discriminated or retaliated against her.

**b. Procedural Irregularities**

Breiterman also cites a host of alleged procedural irregularities in USCP's handling of her case to support her charge of discrimination, challenging nearly every one of USCP's steps along the way. Although an employer's "failure to follow established procedures or criteria" can provide evidence that an employer's proffered legitimate, nondiscriminatory reason for an adverse employment action is pretextual, *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013), "minor procedural irregularities in personnel practices do not themselves give rise to an inference of discrimination," *Breen v. Chao*, 253 F. Supp. 3d 244, 262 (D.D.C. 2017) (cleaned up). Unless "deviations from established procedure" are "unexplained," the plaintiff must show something more to create a jury question as to pretext. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 571 (D.C. Cir. 2019). Breiterman has not done so.

First, Breiterman argues that USCP deviated from its procedures just because it demoted her. Pl's Opp. at 36. She claims that this is a deviation because USCP "rarely" issues penalties greater than a 30-day suspension, it disciplined her more harshly than officers who left their firearms unattended, and "two other high-ranking USCP officials did not believe Breiterman's

demotion was fair or warranted." *Id.*  Even assuming Breiterman's characterization of the record

is accurate, her argument is meritless.  Breiterman does not argue that demotions are not an

available punishment or that they require some specific process that USCP did not follow; she

simply disagrees with USCP's decision that it was appropriate in her case.  *See* Def's UF ¶ 56

(stating that discipline for officials may include demotion).  "Showing pretext, however, requires

more than simply criticizing the employer's decisionmaking process."  *Hairston v. Vance-Cooks*,

773 F.3d 266, 272 (D.C. Cir. 2014).  And likewise, that some Department officials may have

disagreed as to the appropriate punishment does not show procedural irregularity.  Indeed, the

undisputed testimony shows that when DGC DiBiase and Deputy Chief Thomas disagreed as to

the proposed penalty, they followed USCP procedure by raising the issue to the Assistant Chief.

Def's UF ¶¶ 251–52.  In sum, that Breiterman was ultimately demoted is not a procedural

irregularity.

Second, Breiterman similarly objects to Ball's memorandum recommending her

demotion for various reasons.  Pl's Opp. at 36–39.  She claims that it "is more harsh and critical

in its analysis than other disciplinary memos involving more serious conduct," "more heavily

weighs factors like intent and minimizes mitigating factors," and shows that "USCP arbitrarily

considers various factors in determining discipline," by comparing it to a memorandum about an

officer who used USCP computers to solicit sex online.  *Id.*  But again, this reflects Breiterman's

substantive disagreement with USCP's assessment of her conduct, and how USCP weighed

various factors in her case, not a procedural irregularity.  Her only real claim of irregularity of

any kind related to Ball's memorandum is that it includes the "false statement[]" that

"Breiterman knew the unattended gun incident was under investigation."[16] *Id.* at 39; *see* Ball Decl., Attach. 1 at 5. Indeed, Ball's memorandum does assert that Breiterman "was aware that immediately after the weapon was discovered it was retrieved by Department officials and an investigation into how it came to be in that location was initiated." Ball Decl., Attach. 1 at 5. Breiterman testified that she did not know at the time that USCP was investigating the incident, and USCP does not dispute her testimony, at least not directly. *See* Pl's Ex. 17, ECF No. 67-11 (sealed), ECF No. 79-1 (redacted version) at 208:15–211:21. But this is not a procedural irregularity at all, let alone one that suggests discrimination. Even assuming the statement was inaccurate, Breiterman does not claim, and there is no evidence suggesting, that Ball's statement was *intentionally* inaccurate—that Ball was aware at the time that Breiterman did not know about the investigation. Indeed, from Ball's perspective, Breiterman—especially as a supervisor—"should have been aware" that an investigation would have been prompted by such an event, "because that is the Department's regular process." Ball Decl. ¶ 16. At most, even construed most favorably to Breiterman, Ball's assertion that she knew about the investigation is an "innocent mistake" which does not suggest discrimination. *See Brown v. Broad. Bd. Of Governors*, 662 F. Supp. 2d 41, 50 (D.D.C. 2009).

Third, Breiterman argues that USCP unnecessarily expanded and prolonged its investigation by reviewing her phone's contents after confirming that the picture came from her, broadening the scope of its investigation to include her texts with the captain and inspector, and placing her on administrative leave for ten and a half months while the investigation was pending. Pl's Opp. at 39. Once again, Breiterman fails to show that the investigation of the

[16] Breiterman contends that Ball's memorandum contains "false statements," plural, but this is the only example she provides. Pl's Opp. at 39.

contents of her phone contradicted USCP's policy.  To the contrary, USCP represents that its stated policy is to review the contents of any USCP-issued electronic device that an employee uses to commit misconduct, and Sergeant Shutters testified that he confiscated Breiterman's phone because she used it to take the picture she sent to Hess.  *See* Def's UF ¶ 233; Def's Reply at 18; Pl's Ex. 6 at 208:7–21.  Similarly, USCP has consistently maintained—and Breiterman concedes—that it broadened its investigation to include Breiterman's messages with the inspector and captain only after discovering them while searching her device for other unauthorized disclosures to the media.  *See, e.g.*, Pl's Opp. at 22; Def's Ex. 2, Attach. 5 at 208:7–21 (testimony of Sergeant Shutters that he was searching to see if Breiterman had disseminated other law enforcement-sensitive information).  While Breiterman may feel that USCP unfairly broadened its investigation to include matters which had nothing to do with her leak to Hess and about which no one complained, she offers no evidence that it violated its policies or procedures in doing so.

In addition, the length of the investigation and Breiterman's administrative leave, while perhaps unusual, are not atypical enough to suggest unlawful discrimination.  USCP began its investigation into Breiterman's conduct on May 1, 2015, and issued its ROI about four months later, on September 11, 2015.  *See* Shutters Decl., Attach. 4 at 2.  The rest of the disciplinary process—from review of the ROI until Breiterman's demotion—took until May 4, 2016, almost eight more months.  *See* Def's UF ¶ 262.  Altogether, the investigation took about a year, and Breiterman spent about 10 and a half months of that year on administrative leave.  *See* Pl's Opp. at 24.  USCP says that its regulations call for investigations like Breiterman's to be concluded in 120 days, but that deadline only runs from the beginning of the investigation to the creation of the ROI.  Def's UF ¶¶ 36, 38; Def's Ex. 2, Attach. 2 at 125:2–126:5; *id.*, Attach. 5 at 60:1–61:14.

Here, that part of the process took 133 days, a minor procedural irregularity, at most.  *See Breen*, 253 F. Supp. 3d at 262.  And neither USCP nor Breiterman has introduced any evidence prescribing timeframes for the rest of the disciplinary process: review of the ROI, penalty recommendation, appeals, and so on.  *See* Def's Ex. 2, Attach. 2 at 125:2–126:5.

The same goes for the time Breiterman spent on administrative leave.  She claims that when USCP placed her on administrative leave in June 2015, its investigation was almost over, suggesting that her leave was both unnecessary and punitive.  Pl's Opp. at 23, 39; *see* Pl's DF at 74.  But, as explained above, most of the time Breiterman spent on leave corresponded not to USCP's investigation but to the other portions of the disciplinary process for which there is no prescribed time.  And USCP officials consistently testified that its standard procedure is to place an employee on paid administrative leave until the end of the disciplinary process in cases that could lead to termination or demotion, which was the case here.  *See* Def's UF ¶¶ 63, 232; Def's Ex. 2, Attach. 10 at 154:7–21.  True, Sergeant Shutters testified that her leave was "unusually lengthy."  Pl's Ex. 6 at 316:20–22.  *But see* Def's Reply at 18–19 ("[F]ormer OPR personnel confirmed paid administrative leave for several male officers subject to investigation and discipline has extended to ten months or more.").  But even assuming the time Breiterman spent on administrative leave was unusual, that is not equivalent to showing that it was improper or unwarranted—or that it suggests unlawful discrimination.

Fourth, Breiterman claims that Sergeant Shutters's actions in her OPR interview were irregular.  She says that Sergeant Shutters "told her what to put in her written statement and continually asked her if her actions were because she disliked USCP."  Pl's Opp. at 40.  But—in what is by now a familiar refrain—Breiterman does not show that this was a procedural irregularity, let alone one from which the Court can infer unlawful discrimination.  As part of the

OPR interview process, an interview subject must provide a written statement to memorialize the content of the interview.  Def's Ex. 2, Attach. 5 at 48:8–19.  Sergeant Shutters testified that, in general, he would suggest changes or additions if he felt that an interviewee's statement did not include all of the relevant information because it is in the interviewee's best interest to properly memorialize the interview.  *Id.* at 50:9–19.  But if an interviewee disagreed with Sergeant Shutters's suggestions, she would be free to disregard them or write something contrary.  *Id.* at 52:5–9.  That is precisely what happened here: Sergeant Shutters suggested that Breiterman document why she sent the picture to Hess.  Pl's Ex. 6 at 221:9–222:22; Shutters Decl. ¶ 22.  On this point, Sergeant Shutters's testimony is not inconsistent with Breiterman's, who testified that Sergeant Shutters told her that his superiors instructed him to have her include certain points in her statement, but did not say that he made any suggestions about the statement's content.  Pl's Ex. 17 at 237:16–20.  Moreover, the Court sees nothing irregular about Sergeant Shutters asking Breiterman if she was motivated by bad feelings toward USCP, especially since Breiterman was unable to explain why she sent the photo to Hess in the first place.  Pl's Ex. 6 at 221:17–222:7.  And likewise, although Breiterman seems to take offense at Sergeant Shutters's suggestion that she contact the Office of Employee Assistance after her interview, she does not show that was in any way irregular or suggests discrimination.  *See id.* at 235:14–238:22 (testimony of Sergeant Shutters that it is "not unusual" to ask the subject of an OPR interview if she would like to see someone in the Employee Assistance Program).

Fifth, Breiterman claims that USCP improperly placed her on "emergency suspension" and kept her there for ten and a half months.  Pl's Opp. at 40.  Breiterman argues that at the close of her OPR interview, Sergeant Shutters placed her "on administrative leave with pay under the current emergency suspension policy," which was improper because an emergency suspension

was not appropriate in her case and because USCP did not go through the required procedures

for an emergency suspension, including a duty status meeting.  Pl's DF at 71–74; Pl's Opp. at 40.

For its part, USCP argues that it did not place Breiterman on emergency suspension at all, and

that it could not have done so, because the current emergency suspension policy was not in place

until September 2016.  Def's Reply at 19.

The record on USCP's emergency suspension policy, and whether Breiterman was even

subject to such a suspension, is a muddle.  While USCP refers to a September 2016 document

outlining the emergency suspension policy, that document states that it supersedes "existing

policy" on emergency suspensions dating to 2012.  Def's Ex. 8, Attach. 8, Ex. 1.  So while

USCP could not have suspended Breiterman under the 2016 version of the policy, it still could

have imposed an emergency suspension on her under the old one, on which the record is silent.

USCP represents that an emergency suspension is "a process the Department uses to permit a

low-level supervisor or subordinate employee to place another employee in a temporary status

and revoke police powers in an emergency situation pending review by a Bureau Commander on

the next available business day during business hours."  Def's UF ¶ 69.  Consistent with this

description, one USCP witness testified that emergency suspensions are used "when the

employee is a danger to themselves, a danger to others, or a danger to the Department."  Def's

Ex. 2, Attach. 9, ECF No. 65-6 at 60:18–61:2; *see also id.*, Attach. 8, ECF No. 65-6 at 81:7–10.

Still, contrary to USCP's representations here, Sergeant Shutters testified that Breiterman *was*

placed on emergency suspension under the policy that was in place in 2015.  *Id.*, Attach. 5 at

104:9–13.  Assistant Chief Verderosa, although at first concurring that an emergency suspension

serves to immediately relieve an officer from duty under exigent circumstances, usually

overnight, also conceded that Breiterman's placement on leave fit the definition "in a strict

sense" because she was immediately relieved from duty. *Id.*, Attach. 2 at 51:2–52:12, 63:13–65:22. Deputy Chief Thomas, for his part, testified that an officer can be placed on administrative leave and have her police powers revoked because of allegations of misconduct without that placement constituting an emergency suspension. *Id.*, Attach. 6 at 111:2–6.

Assuming Breiterman was subject to an emergency suspension, she has presented some evidence that the suspension was irregular. Although USCP represents that emergency suspensions are justified by, well, emergencies, it does not argue that Breiterman was a danger to herself, others, or the Department when she was relieved from duty, and the alleged suspension did not take place outside normal business hours. One USCP employee testified that, in his opinion, an emergency suspension would "absolutely not" be justified for an officer who provided a photo to the press. Def's Ex. 2, Attach. 8 at 82:10–22. And it does not appear that Breiterman was afforded the duty status meeting that the policy required. Pl's Ex. 6 at 240:13–241:12.

But none of these potential irregularities amount to much because—even construing the record in the light most favorable to Breiterman—none of them cast doubt on whether, as explained above, someone in Breiterman's shoes would typically be placed on administrative leave with pay while her conduct was investigated and adjudicated. Whether the method of accomplishing that was termed an "emergency suspension" or something else does not matter. And indeed, the confusion about USCP policy and Breiterman's case appears to be largely semantic. After all, Assistant Chief Verderosa and then-OPR head Inspector Kimberlie Bolinger, for example, both stated that Breiterman was not placed on emergency suspension before conceding that her case fit the technical definition of emergency suspension. Def's Ex. 2, Attach. 2 at 63:4–64:5; Pl's Ex. 7, ECF No. 66-9 at 164:12–169:17; *see also id.* at 149:18–

150:14 (testimony of Inspector Bolinger that OPR did not use the term "emergency suspension" while she was working there). And Assistant Chief Verderosa explained that, in his mind, even if Breiterman's case met the technical definition of an emergency suspension, no duty status meeting was necessary because Breiterman was afforded alternative process in her OPR interview, while most emergency suspensions take place without prior investigation. Def's Ex. 2, Attach. 2 at 65:16–22. In the end, despite the confusion about the proper label for how Breiterman was placed on administrative leave with pay, any procedural irregularity along these lines does not support an inference of discrimination because her placement on administrative leave with pay was consistent with USCP policy.[17]

Sixth, Breiterman argues that Inspector Bolinger improperly remained involved in her investigation after purporting to recuse herself. Pl's Opp. at 40–41. When USCP investigated Breiterman's conduct, Inspector Bollinger, who ran OPR, would have ordinarily had to approve the ROI. *See* Pl's Ex. 7 at 58:8–59:10. But in July 2015, she recused herself from the investigation, "keeping [her] hands out of it" because some of Breiterman's text messages, which were by then being examined by investigators, contained disparaging remarks about her husband, Captain Andrew Bolinger. *Id.* at 188:6–189:14, 191:14–21, 199:6–200:7. Breiterman claims that Inspector Bolinger violated her recusal by continuing to receive updates on the status of the investigation, recommending a potential charge, and ultimately approving the final charge. Pl's Opp. at 25, 40–41. Inspector Bolinger testified that she received emails and updates on Breiterman's case because as head of OPR she had to know the status of ongoing investigations,

[17] Breiterman's argument that she was kept on emergency suspension for the duration of her case, Pl's Opp. at 40, is contradicted by her own statement of facts, in which she admits that she was "placed on administrative leave with pay" and "remained on administrative leave for 10 and ½ months," Pl's DF at 71.

but she did not provide any opinion or guidance in response to those updates or engage in any decision-making about Breiterman's case. Pl's Ex. 7 at 59:16–62:17, 191:14–21, 199:6–200:7. Indeed, no evidence supports Breiterman's allegation that Inspector Bolinger "was involved in sustaining charges that resulted in discipline" against her. Pl's Opp. at 41. Her purported support for this allegation is a USCP interrogatory response stating that "Lieutenant Christopher Breme and/or Inspector Kimberly [sic] Bolinger approved the sustained charges resulting in discipline," which by its own terms leaves open the possibility that Inspector Bolinger did not approve the charges. Pl's Ex. 50, ECF No. 66-52 at 18–19. And in fact, Breiterman's ROI was signed by Lieutenant Breme, as well as Inspector Patrick Herrle, who replaced Inspector Bolinger as head of OPR. Shutters Decl., Attach. 4 at 16; Pl's Ex. 7 at 16:18–17:5. Inspector Bolinger testified that, consistent with her recusal, she never saw the ROI recommending charges against Breiterman. Pl's Ex. 7 at 216:22–218:17. Ultimately, Breiterman has not shown that anything about Inspector Bolinger's recusal from the disciplinary process that led to her demotion was irregular.[18]

Seventh, Breiterman argues that USCP inappropriately referred her case to OIG, which usually conducts investigations separately from OPR. Pl's Opp. at 41. She claims that when OPR had trouble downloading her text messages with the inspector and captain, it reached out to OIG for help, rather than following the usual procedures, which in her view would be to contact

---

[18] In addition, the "potential charge" Breiterman alleges that Inspector Bolinger suggested was related to a separate matter. Apparently, at one point OPR considered whether to charge Breiterman with being absent without leave when she was unable to come in for an interview while she was on administrative leave. Pl's Ex. 7 at 220:6–223:15. But Inspector Bolinger never said that she intended to recuse herself from all matters involving Breiterman, and Breiterman points to no policy Inspector Bolinger violated. In any event, USCP did not ultimately charge Breiterman with being absent without leave.

the two employees to retrieve the messages from their devices. *Id.*; *see* Pl's Ex. 49, ECF No. 66-51 (letter from OPR to OIG about the messages and technical difficulties retrieving them). This claim fails to raise the specter of discrimination for at least three reasons. First, while OPR did contact OIG about the messages, there is no evidence that it contacted OIG for help *retrieving* the messages as she asserts. Second, Breiterman provides no support for her claim that proper procedure would have been to attempt to retrieve the messages directly from the inspector and captain. And third, there is no evidence that OPR referred Breiterman's disciplinary case to OIG at all. The only referral to OIG the record reflects is for an investigation into the roles of the captain and inspector in the inappropriate messages, because OIG investigates misconduct by employees of their ranks.[19] *See* Def's Reply at 20–21; Def's Ex. 2, Attach. 3 at 63:11–64:5; *id.*, Attach. 5 at 307:10–21.

Finally, Breiterman argues that USCP "disproportionally weighed intent and trust" in Breiterman's case and that it "has taken shifting positions on a number of critical issues related to" her case, citing a grab-bag of grievances. Pl's Opp. at 41. This claim, like others above, is not really about procedural irregularities at all. It is a repackaging of her arguments that she was treated unfairly in comparison with other USCP employees, which the Court has already rejected. And to the extent Breiterman intends to invoke the maxim that "shifting and inconsistent justifications are 'probative of pretext,'" this, too, fails. *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (quoting *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001)). Although she says that USCP has taken shifting positions on "a number" of critical

[19] It is puzzling, to say the least, that Breiterman asserts that OPR showed favoritism by failing to discipline the captain and inspector while simultaneously objecting to its referral of the matter to the component with the power to discipline them. Indeed, Breiterman complains that OPR "did not [] search the male supervisors' devices or investigate them" *in the same sentence* that she claims that OPR improperly contacted OIG. Pl's Opp. at 41.

issues, the only one she cites is, yet again, that USCP disciplined and investigated her for her messages with the captain and inspector but failed to discipline them. Pl's Opp. at 41. While Breiterman may feel aggrieved by what she views as disparate treatment on this point, that does not mean that USCP has changed any of its justifications.

In summary, Breiterman argues that this "mosaic of circumstantial evidence"—the eight arguments described above—creates a genuine issue of material fact about whether USCP's explanation for demoting her is a pretext for gender discrimination. Pl's Opp. at 41–42. But eight times zero is still zero. The only even *potential* procedural irregularities that Breiterman identifies are the length of her paid administrative leave and USCP's use of an emergency suspension to place her in that status. But Breiterman does not cast doubt on the length or propriety of her paid administrative leave through the conclusion of the appeals process, which is standard for employees facing demotion or termination, or show how these potential irregularities suggest discrimination. *See Baylor v. Powell*, No. 17-cv-2647 (TJK), 2020 WL 2064080, at *6 (D.D.C. Apr. 29, 2020).

* * *

Neither Breiterman's purported comparator evidence nor evidence of alleged procedural irregularities in the USCP process suffices to cast doubt on USCP's asserted legitimate, nondiscriminatory reason for placing her on administrative leave and then demoting her: that she committed a violation of USCP rules that called into question her ability to continue as a supervisor, especially when coupled with her substantial disciplinary history. Because there is no genuine dispute as to any material fact, USCP is entitled to judgment on this gender discrimination claim as a matter of law and the Court will grant its motion as to this claim as well.

**2. Congressional Accountability Act Retaliation**

As with her claim about her two-day suspension, Breiterman claims that her demotion stemmed from unlawful retaliation for her previous EEO complaint. Pl's Opp. at 42–3. Her evidence is the same, and it fails for largely the same reasons. Once again, her only evidence of retaliatory motive is that Sergeant Shutters knew of her prior EEO complaint. *Id.* at 43. And while Breiterman objects to Sergeant Shutters's conduct during her interview, as explained above, those complaints do not suggest retaliation. As with the case that led to her two-day suspension, Sergeant Shutters and OPR had no role in determining her discipline. *See* Def's UF ¶ 40. Because Breiterman shows no causal connection between her prior EEO complaint and her demotion, USCP is also entitled to summary judgment on this claim. *See Moran*, 82 F. Supp. 3d at 127.

**3. First Amendment Retaliation**

Finally, Breiterman argues that her demotion constitutes unlawful retaliation for the exercise of her First Amendment right to freedom of speech. "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). A public employee alleging retaliation in violation of her First Amendment rights must show that the employer took an adverse action against her, *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994), and then must meet a four-factor test:

> First, the public employee must have spoken [i] as a citizen [ii] on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that her speech was a substantial or motivating factor in prompting the retaliatory or

> punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

*Hawkins v. District of Columbia*, 923 F. Supp. 2d 128, 136–37 (D.D.C. 2013) (quoting *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007)). "The first two factors . . . are questions of law for the court to resolve, while the latter are questions of fact ordinarily for the jury." *Wilburn*, 480 F.3d at 1149 (quoting *Tao*, 27 F.3d at 639) (alteration in original).

Even assuming that Breiterman spoke as a citizen and on a matter of public concern, her First Amendment claim falters at the second factor: whether the government's interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern.

Courts may consider various circumstances when weighing the employer's and employee's interests. The Supreme Court has recognized "as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Also relevant are the time, place, and manner of the employee's speech. *Id.* And the D.C. Circuit has held that "because of the special degree of trust and discipline required in a police force there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees." *O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998). On the other hand, "when a police officer speaks out on an issue that he is uniquely qualified to address, [the Court] must be cautious in accepting the claim that the public interest demands that he be silent." *Id.*

Although not a slam dunk for USCP, its interest outweighs Breiterman's. To begin with, Breiterman's conduct checks many of the boxes the Supreme Court identified in *Rankin* that harm USCP's legitimate interests. USCP found that Breiterman violated its media policy by, instead of referring Hess to others at USCP to handle the press inquiry, speaking to her about the January 29 incident and providing her the photo of the firearm she took when she responded to the scene. *See* Shutters Decl., Attach. 4; Ball Decl. ¶¶ 13, 17; *id.*, Attach. 1 at 2–3, 5 & n.3. USCP has a crucial interest in ensuring that its law enforcement officers—who are often privy to all manner of sensitive information, especially in connection with their investigations—safeguard and protect that information, as opposed to providing it to the press. *See* Ball Decl. ¶¶ 13, 17; *id.*, Attach. 1 at 2–3, 5 & n.3. Breiterman "interfere[d] with the regular operation" of USCP by flouting this important standard expected of its law enforcement officers. *Rankin*, 483 U.S. at 388; *see Connick v. Myers*, 461 U.S. 138, 153 n.14 (1983) (noting that the violation of an announced policy strengthens the employer's claim).

Breiterman's failure to follow the media policy also impaired harmony among her coworkers by subjecting the officer who left his firearm unattended to intense media and congressional scrutiny, interfered with the ordinary course of USCP discipline for the officer, damaged her own working relationships, and—crucially—made it impossible for her to continue to function as a supervisor by undermining both her superiors' and her subordinates' trust and confidence in her. *See* Def's Ex. 2, Attach. 2 at 157:10–160:1 (testimony of Assistant Chief Verderosa that the officers at fault for leaving their firearms unattended were denied the privacy that "everyone else gets" because of Breiterman's actions); Verderosa Decl. ¶ 8 (noting that Chief Dine answered questions at a congressional hearing about the discipline given to the officer involved in the incident to which Breiterman responded). Assistant Chief Verderosa

testified that he felt Breiterman could not continue in a supervisory role because her actions eroded her subordinates' trust in her and were "detrimental to the good order of the officers."[20] Def's Ex. 2, Attach. 2 at 162:1–164:12; *see Tao*, 27 F.3d at 641 n.5 (noting that the employer's interests are stronger where the employee's speech "was disruptive to the functioning of the office . . . or would impair discipline or working relationships"). These interests are highly important to any law enforcement organization, let alone one charged with protecting government officials, visitors, and the public in and around the United States Capitol. And where, as here, "close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52.

Breiterman, to be sure, was not without some interest in speaking out, since the issue related to public safety. USCP questions whether Breiterman genuinely spoke out of concern for public safety because during her initial interview she could not explain why she had talked to Hess and sent her the photo. *See* Def's Br. at 45; *see also* Pl's Ex. 6 at 221:17–222:7 (testimony of Sergeant Shutters that Breiterman indicated she did not know why she provided the information to Hess). Moreover, unlike in her later interview and deposition, Breiterman initially conceded in her written statement that she "made a poor decision to send the picture. This was department information," which seems at odds with such a motivation. Shutters Decl., Attach. 3. Nonetheless, for purposes of her First Amendment claim and construing all the

[20] In this way, Breiterman's case is unlike *Hawkins v. District of Columbia*, 923 F. Supp. 2d at 133. In that case, where the Metropolitan Police Department employee-plaintiff prevailed on his First Amendment claim after publicly criticizing a department policy, he had harmed department discipline and cohesion only to the extent to which his superiors were upset to be criticized publicly. *Id.* at 142. Here, after USCP found that Breiterman had violated its policy that forbids leaking investigatory information to the media, it also determined that her ability to function effectively as a supervisor was compromised.

evidence in Breiterman's favor, the Court assumes that she was prompted to speak out for public safety reasons. And while USCP argues that Breiterman's asserted public safety concern is "unavailing" because the incident had been resolved and there was no immediate threat to the public when she sent the photo to Hess, Def's Br. at 41, the Court cannot agree, given that USCP misconduct had apparently produced a pattern of unattended firearms that might reasonably have prompted worry about whether it would continue.

Breiterman asserts that she confirmed the details about the unattended firearm on January 29, 2015, and sent the photo to Hess because, after Hess told her about two similar incidents, she was shocked by the repeated violations and USCP's failure to remedy the problem. *See* Pl's Opp. at 20–21, 44. This was, at least arguably, an attempt to expose "wrongdoing or breach of public trust." *Connick*, 461 U.S. at 148. But Breiterman's interest erodes somewhat once the specific circumstances of her speech are examined. She was not, for example, "uniquely qualified" to address the broader circumstances she says concerned her: the threat to public safety posed by these three incidents and USCP's purported lack of attention to them. *O'Donnell*, 148 F.3d at 1135; *see* Def's Ex. 6. Far from it. She apparently knew nothing about the other two incidents before Hess told her about them. And there is nothing in the record that suggests she had any idea how USCP had handled them, including the January 29 incident to which she responded.[21] In sum, her personal knowledge was limited to a single failing by a USCP officer. This lack of knowledge about the risk to public safety posed by this series of

[21] Breiterman did suspect that no discipline against the officer involved in the January 29 incident was forthcoming because she had seen him with his firearm afterward and was not aware of any disciplinary investigation. Pl's Ex. 17 at 229:17–232:8. As discussed above, Breiterman's assumption was incorrect.

incidents, and how USCP was addressing that risk through its disciplinary process or otherwise, undercuts the strength of her alleged interest in speaking out.

Moreover, there is nothing in the record to suggest that Breiterman ever raised her concerns with anyone at USCP before speaking to Hess. To be sure, there is no exhaustion requirement for a government employee to exercise her First Amendment rights. But Breiterman's failure to ever pursue the issue internally at USCP both underscores her own lack of knowledge about the broader public safety issue and further undermines the strength of her interest in deciding to turn to the press to speak about it. And finally, her interest in providing the photo to Hess is further weakened by her own concession that she did not intend for the photo to be published, and she makes no argument that it contributed much to the public understanding about what happened. Pl's Ex. 17 at 220:17–222:5. Thus, she can hardly now assert that she had a strong interest in disclosing it to the public.

Ultimately, USCP had a strong interest in disciplining Breiterman for disclosing the information and photo to Hess because, it concluded, she violated its media policy that prohibits disclosure of investigatory information to the media, interfered with the ordinary course of USCP discipline of the officer, and impaired her own ability to function as a supervisor. Considering all the circumstances here, that interest outweighed Breiterman's in providing the information and photo to the press. For these reasons, the Court will grant USCP summary judgment on Breiterman's First Amendment claim.

## IV. Conclusion

For all the above reasons, the Court will grant Defendant USCP's Motion for Summary Judgment, ECF No. 65. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 4, 2020